IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TORIANO YOUNG, | No. C 07-3905 JSW (PR) |
| Petitioner, | **ORDER DENYING HABEAS CORPUS PETITIONS AND GRANTING CERTIFICATES OF APPEALABILITY** |
| vs. | |
| JOE MCGRATH, | |
| Respondent. | |
| JASON J. PAYNE, | No. C 07-4712 JSW (PR) |
| Petitioner, | |
| vs. | |
| JOE MCGRATH, Warden, | |
| Respondent. | |

These pro se habeas corpus cases were separately filed by state prisoners who were jointly tried and convicted. The Court granted Respondent's motion to relate the cases. Both Petitioners raise the same issues.

The court ordered Respondent to show cause why the petitions should not be granted. Respondent has filed answers and memoranda of points and authorities in support of the answers, and has lodged exhibits with the court. Petitioners each have filed a traverse. For the reasons set out below, the petitions are denied.

///

///

**BACKGROUND**

Petitioners were jointly tried. *People v. Young*, 2006 WL 2037350, *1-2 (Cal. App. 2006). After two mistrials, one because the jury could not reach a verdict and one because of illness of a defense lawyer, both Petitioners were convicted of the murder of Jonathan Washington, with enhancements; conspiracy to commit murder; three counts of second degree robbery; sale of controlled substances; and street terrorism. In addition, Young was convicted of being an accessory to murder and conspiracy to commit the crime of accessory. *Id.* The court sentenced Payne to serve a total of forty-seven years and eight months to life, and Young to a total of twenty-seven years and eight months to life.

Both Petitioners appealed. The California Court of Appeal affirmed both convictions. *Id.* at *1. It also affirmed the sentences except as to the street gang enhancements, which it struck. *Id.* at 9. The case was remanded for re-sentencing. *Id.* Petitioners were re-sentenced to the same terms as were originally imposed, minus two years on the determinate portion of the sentence. Their petitions for review in the California Supreme Court were denied.

As grounds for habeas relief, Petitioners assert that: (1) their rights to due process and a fair trial were violated by the trial court's inadequate inquiry into alleged jury misconduct; (2) the trial court's instruction on reasonable doubt violated their constitutional rights; and (3) the trial court's instructions on consciousness of guilt violated their due process rights.

Because Petitioners' issues do not involve the facts of the crimes, an extensive narrative is unnecessary; instead, the facts relevant to the issues will be included in the discussion of each issue, below.

**STANDARD OF REVIEW**

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).  The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13.  A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.  The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.  Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. 322 at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079, n. 2 (9th Cir.2000).

///

## DISCUSSION

**I.     Juror Misconduct**

Petitioners contend that the trial court's investigation of possible juror misconduct was so deficient as to violate their due process rights.

"Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). Clearly established federal law, as determined by the Supreme Court, does not require state or federal courts to hold a hearing every time a claim of juror bias is raised by the parties, however. *Tracey v. Palmateer*, 341 F.3d 1037, 1045 (9th Cir. 2003). The United States Supreme Court decisions on the point, *Smith* and *Remmer v. United States*, 347 U.S. 227 (1954), provide a "flexible rule." *Tracey*, 341 F.3d at 1044. As an illustration, in *Tracey* the court conducted a brief hearing with an excused juror who had overheard other jurors expressing opinions about the case; the *Tracey* court concluded that this inquiry, which did not extend to interviewing the jurors who had expressed opinions, was sufficient, even under Ninth Circuit standards. *Id.* 1044-45.

This claim was raised on direct appeal; the court of appeal set out the facts as to this issue:

> The verdicts against appellants were reached by the jury on September 20, 2001. On November 9, 2001, the prosecutor went to the trial judge and asked to make a statement concerning certain posttrial information the prosecutor had learned about the case. The prosecutor stated that he had heard in late September, after the trial ended and the jury had been discharged, that Detective Harrison and one of the jurors (Juror No. 12) had entered into a social relationship. The prosecutor explained his understanding that the relationship began after the jury had been discharged, and he did not know if it was ongoing as of that date. After it was brought to his attention, he discussed it with Harrison, who confirmed the existence of the social relationship.
>
> The judge and the prosecutor then discussed whether it was a matter that should be disclosed to defense counsel. Although the prosecutor expressed the view that there was no need to do so because the relationship

4

began after the jury had been discharged and thus, there were no "legal ramifications" arising from it, the judge wanted some additional time to consider the issue. For the time being, the judge ordered that the conversation be transcribed but the copies delivered sealed to the court.

All counsel was called in by the court for a hearing on November 16. The judge indicated he had decided to make the transcript of the prosecutor's disclosure available to defense counsel, and that he would investigate the matter by interviewing Juror No. 12, and by separately questioning Harrison. At this point, the court stated that the transcripts would only be made available to counsel and not to appellants, and that defense counsel were not to discuss the matter with appellants for the time being.

A further hearing was held on December 27, 2001, and the judge began by asking defense counsel to confer with appellants to determine if either wished to be present while Juror No. 12 and "one of the witnesses" were being interviewed. This would include telling them what the hearing was about. Defense counsel discussed the matter with their respective clients and then reported to the court that appellants wished to be present when Harrison was interviewed, but not for the interview of Juror No. 12. Appearance waivers were taken by the court from appellants.

Juror No. 12 then was interviewed on the record and under oath. She confirmed that she first had contact with Harrison after the verdicts were rendered and the jury had been discharged. She first spoke to him when about six of the former jurors, the prosecutor, and Harrison went to lunch at the Claim Jumper restaurant in Concord immediately following the verdicts, the polling of the jurors, and the jury's discharge. Juror No. 12 gave her telephone number to Harrison, who called her a couple of days after the lunch. She had also exchanged telephone numbers with the court reporter who had attended the lunch as well. Since then Juror No. 12 continued to see Harrison about once a week.

The juror confirmed that during the course of the trial there was no indication that Harrison might have been interested in her; no smiling, opening of doors, "nothing like that." Nothing about his conduct indicated to Juror No. 12 that Harrison might have been interested in her until after the jury's discharge. They did not pass notes during the trial.

As to their meeting, Juror No. 12 explained that during the lunch she learned that she and Harrison had attended the same high school. She did not remember him from school. The judge sustained objections to efforts to determine if the resulting relationship was sexual, or other details about the relationship, but did allow Juror No. 12 to confirm she had an on-going dating relationship with Harrison.

Juror No. 12 also stated that she spoke with Harrison after she received a letter informing her of the scheduling of this hearing. He told her the reason for the hearing and for her not to worry about it because they had met after the trial was finished and she did not do anything wrong. She did not discuss with Harrison what she should do if she were contacted by an investigator about the trial.

Harrison was next questioned under oath. He confirmed that he first spoke to Juror No. 12 at the Claim Jumper lunch after the trial had concluded.

5

> Before that he had no contact with her during the trial including no verbal or "nonverbal communication ... no messages, no indirect messages, no subliminal messages." He confirmed that he asked Juror No. 12 for her telephone number at the lunch, he called her socially a week or so after that, and he had continued to see her once a week since then. While they went to the same high school and were a few classes apart, Harrison did not know her while they were in school, and he had no contact with her before their meeting at lunch after trial.
>
> At the conclusion of the questioning, the matter of whether Harrison was married or legally separated from his wife became a topic for discussion. Young's counsel wanted to subpoena the wife to determine if the two were indeed separated, while the prosecutor suggested instead that the court's family law file be reviewed by the judge. The matter was not resolved. The court ordered the transcript of the hearing sealed, but copies made available to counsel who could review it and discuss it with appellants.
>
> Another hearing with the court took place on April 26, 2002. Young's counsel asked the court to have Harrison's family law file made available so his marital status could be explored by counsel. Counsel also asked that the other members of the jury be interviewed as well as the source from whom the prosecutor first learned about the social relationship.
>
> The court refused these requests[,] finding that Juror No. 12's answers were truthful, and that she did not have any contact with Harrison during the trial. The matter was continued to allow defense counsel to complete their investigation and argument concerning the issue.
>
> At another hearing on July 19, 2002, Young's counsel sought confirmation from the prosecutor as to who else might have told him about the relationship between Juror No. 12 and Harrison, to enable the defense to investigate the matter further. Counsel also wanted the transcripts of the questioning unsealed. The court indicated a desire to have the prosecutor file a declaration under seal setting forth the circumstances by which he learned of the relationship.

*Young*, 2006 WL 2037350 at *6-8.

The court of appeal rejected Petitioner's contention that the trial court's investigation was insufficient, finding that the contact between the detective and the juror "began only *after the trial was completed, the verdicts rendered, and the jury discharged*." *Young*, 2006 WL 2037350 at *8 (emphasis in original). It noted that the trial court found juror twelve believable on that point, and said that "appellants have not come forward with any information to suggest otherwise." *Id.* The court of appeal concluded that there thus was no need for a more thorough investigation. *Id.*

The court of appeal apparently did not realize that an affidavit provided by the prosecutor at the time of the appeal, five years after the trial, contained evidence that

6

1  "suggest[s] otherwise." (Supp. Ex. A10.) At the time of the appeal in 2006, Petitioners'
2  motion to settle the record was granted by the court of appeal, which ordered the trial
3  court to take such steps as might be necessary to settle the record. (Supp. Ex. A9.) The
4  trial court unsealed some transcripts and included them and a declaration by the
5  prosecutor in a supplemental record. (Supp. Ex. A11.) The prosecutor says in his
6  declaration that "[a]ter returning its verdict on September 17, 2001, most of the jurors
7  retired to the Claim Jumpers restaurant in Concord for dinner . . . [t]he jurors invited the
8  detectives and me to join them in celebrating the end of a long trial." (Supp. Ex. A10.)
9  Detective Harrison and juror twelve exchanged phone numbers at this dinner, and the
10 prosecutor later was told by Harrison's partner that Harrison and juror twelve had gone
11 out over the weekend following the dinner. (*Id*.) The prosecutor's signature on the
12 declaration is dated March 2, 2006, so it appears to have been prepared – more than five
13 years after the events described in it – as part of the process of settling the record for the
14 appeal.

15  Petitioners point out, correctly, that the jury did not return its verdict until
16 September 20, 2001. (*See* Ex. A6, vol. 6, 1964-1995 [verdict forms]; 2095-2107 [clerk's
17 minutes].) If the dinner described in the prosecutor's affidavit did occur on September
18 17, 2001, as he says in the affidavit, the exchange of telephone numbers mentioned there
19 would have been before the discharge of the jury, contrary to the court of appeal's
20 finding that there was no evidence that the detective and the juror had contact before
21 discharge of the jury.

22  The case is in an odd procedural posture. The trial court did not have the
23 prosecutor's declaration before it, and it conducted not just one but three on-the-record
24 hearings. There was no evidence whatever that there was social contact between the
25 detective and the juror before completion of the case, so given the evidence available to
26 it at the time, the trial court most certainly did not violate Petitioners' rights in failing to
27 investigate further. The prosecutor's declaration was included in the supplemental
28 record on appeal, however, so contrary to the statement by the court of appeal,

7

Petitioners *had* "come forward with any information to suggest otherwise." *Young*, 2006 WL 2037350 at *8. But this does not resolve the crucial point, which is whether the court of appeal's finding of fact that the contact occurred only after the verdict was returned and the jury discharged is "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

The prosecutor's affidavit itself says that the dinner was after the verdict had been returned, and was to celebrate the end "of a long trial," statements that conflict with the September 17 date in the declaration, and which suggest that the date was an error. (Supp. Ex. A10 at ¶¶ 5-6.) In addition, both Detective Harrison and juror twelve testified that the dinner was after the verdict had been returned, as indeed common sense suggests is more likely than its occurring during deliberations. (Supp. Ex. B21 at 3270-75 [juror]; 3292-97 [Harrison].) For these reasons, it was not unreasonable, in light of the evidence before it, for the court of appeal to find that the social relationship between the detective and the juror began only after completion of the trial. The trial court's investigation was sufficient for a matter that involved only post-verdict contacts, and because that was all that was involved, the court of appeal's rejection of this claim was not contrary to, or an unreasonable application of, clearly established Supreme Court authority. This claim is without merit.

## II.     Reasonable Doubt Instruction

Petitioners contend that the trial court's instructing the jury with CALJIC 2.90, which defines "reasonable doubt," violated due process.

The "beyond a reasonable doubt" standard is a requirement of due process, but the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course. *Victor v. Nebraska*, 511 U.S. 1, 6 (1994). So long as the trial court instructs the jury on the necessity that defendant's guilt be proven beyond a reasonable doubt, the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof. *Id.*

In *Victor*, the United States Supreme Court rejected a challenge to a previous

8

version of CALJIC 2.90 and affirmed the judgment of the California Supreme Court. *Id.* However, the Supreme Court noted that the phrase "moral certainty" might not be recognized by jurors as a synonym for "beyond a reasonable doubt," stating that "an instruction cast in terms of an abiding conviction as to guilt, without reference to moral certainty, correctly states the government's burden of proof." *Id.* at 14-15.

In light of *Victor*, the California Supreme Court declared in *People v. Freeman*, 8 Cal. 4th 450, 504 (1994), that "trial courts might, in the future, safely delete the following phrases in the standard instruction: 'and depending on moral evidence' and 'to a moral certainty.'" *Id.* at 504. Following *Freeman*, CALJIC No. 2.90 was revised to delete those two phrases. Five years later, in *Lisenbee v. Henry*, 166 F.3d 997, 999-1000 (9th Cir. 1999), the Ninth Circuit rejected a constitutional challenge to the revised instruction, relying on the Supreme Court's rationale in *Victor* that use of the term "abiding conviction" to define reasonable doubt is constitutionally sound. *Id.* at 999-1000.

The trial court in this case gave the revised version of CALJIC No. 2.90, the one approved by the Ninth Circuit in *Lisenbee* as correctly reflecting the Supreme Court's holding in *Victor*. It thus is clear that giving the instruction did not violate due process. This claim is without merit.

### III.     Consciousness of Guilt Instruction

Petitioners contend that their Fifth, Sixth, and Fourteenth Amendment rights were violated by the trial court's giving two jury instructions regarding consciousness of guilt, CALJIC 2.06 and 2.52.

Petitioner Payne's petition says only this about this issue: "Petitioner was denied his rights to a fair jury trial and due process of law under the Fifth, Sixth and Fourteenth Amendments when the trial court used CALJIC Nos. 2.06 and 2.52." He does not explain his legal theory, nor does he provide any supporting facts.

Petitioner Young's petition phrases the issue this way: "Petitioner was denied his rights to a fair jury trial and due process of law under the Fifth, Sixth and Fourteenth

9

Amendments by the trial court[']s instruction on consciousness of guilt in CALJIC Nos. 2.06 and 2.52." Young provides no further explanation of his legal theory, nor does he provide any supporting facts.

This issue was raised on direct appeal. The Petitioners' arguments were largely based on state law, but they also raised the constitutional argument that the instructions emphasized portions of the evidence that benefitted the prosecution, thereby reducing its burden of proof. (*See*, *e.g.*, Ex. D-1 at 6-7 (Young's petition for review); D-2 at 7-15 (Payne's petition for review).) In the absence of any other explanation for this issue, the Court will assume that the argument is the same here as it was on direct appeal.[1]

This version of CALJIC 2.06 was given to the jury:

> If you find that a defendant attempted to suppress evidence against himself in any manner, such as by the intimidation of a witness or by concealing evidence, this attempt may be considered by you as a circumstance tending to show a consciousness of guilt. However, this conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are for you to decide.

*Young*, 2006 WL 2037350 at *2.

This version of CALJIC 2.52 was given to the jury:

> The flight of a person immediately after the commission of a crime, or after he is accused of a crime, is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding whether a defendant is guilty or not guilty. The weight to which this circumstance is entitled is a matter for you to decide.

*Id.* at *3.

In ruling on this issue on direct appeal, the court of appeal relied on *People v. Boyette*, 29 Cal. 4th 381 (2002). *Young*, 2006 WL 2037350 at *3. The court of appeal quoted *Boyette*, which in turn was quoting *People v. Jackson*, 13 Cal. 4th 1164 (1996). *Id.* "'[[T]hese instructions] benefit[] the defense, admonishing the jury to circumspection regarding evidence that might otherwise be considered decisively inculpatory . . . these consciousness-of-guilt instructions did not improperly endorse the persecution's theory

---

[1] Petitioners' traverses are silent on the issue.

10

or lessen its burden of proof . . . .'" *Boyette*, 29 Cal. 4th at 438-39 (quoting *Jackson*, 13 Cal. 4th at 1224).

Petitioners' theory is that the instructions highlight prosecution evidence and thus disadvantage them. It is true that the instructions mention evidence unfavorable to the defense – flight or attempts to suppress evidence – but only as part of a warning to the jury that such evidence is not sufficient by itself to establish guilt. That is, the instructions are warnings, and warnings favorable to the defense, not pro-prosecution instructions. Giving the instructions thus did not reduce the prosecution's burden of proof, so did not violate Petitioners' constitutional rights. This claim is without merit.

**IV.    Appealability**

The federal rules governing habeas cases brought by state prisoners require a district court that denies a habeas petition to grant or deny a certificate of appealability in the ruling. *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (effective December 1, 2009).

A petitioner may not appeal a final order in a federal habeas corpus proceeding without first obtaining a certificate of appealability (formerly known as a certificate of probable cause to appeal). *See* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b). A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The certificate must indicate which issues satisfy this standard. *See id.* § 2253(c)(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 120 S.Ct. 1595, 1604 (2000).

Issue one involves an odd procedural situation, in which the record on appeal was different than that before the trial court, and an apparent error by the court of appeal in saying that there was no evidence that the detective and juror had a social relationship before discharge of the jury. For these reasons, this court's rejection of the claim might

11

be debatable among reasonable jurists. The other two issues are simple and the correct result obvious. Certificates of appealability will be granted as to issue one, and denied as to the other two issues.[2]

**CONCLUSION**

The petitions filed by petitioners Young and Payne are DENIED. Certificates of appealability are GRANTED in both cases as to issue one only. The Clerk shall close the files.

**IT IS SO ORDERED.**

DATED: June 30, 2010

*Jeffrey S. White*
JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE

---

[2] Petitioners should note that despite the grant of a certificates of appealability in each case, if either wishes to appeal he must file a notice of appeal.

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

TORIANO YOUNG,

        Plaintiff,

  v.

JOE MCGRATH et al,

        Defendant.

Case Number: CV07-03905 JSW

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on June 30, 2010, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Toriano Young
V30104
CSP-Solano
P.O. Box 4000
Vacaville, CA 95696-4000

Dated: June 30, 2010

*Jennifer Ottolini*

Richard W. Wieking, Clerk
By: Jennifer Ottolini, Deputy Clerk

United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

JASON PAYNE,

Plaintiff,

v.

JOE MCGRATH et al,

Defendant.

_______________________________________/

Case Number: CV07-04712 JSW

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on June 30, 2010, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Jason J. Payne
V26575
CSP Solano
P.O. Box 4000
Vacaville, CA 95696

Dated: June 30, 2010

Jennifer Ottolini

Richard W. Wieking, Clerk
By: Jennifer Ottolini, Deputy Clerk